In re NGAN GUNG RESTAURANT,
Debtor.

John S. Pereira, Chapter
7 Trustee, plaintiff,

v.

Henry C.S. Foong, defendant.

Bankruptcy No. 95–B–40383.
Adversary No. 00–8021A.

United States Bankruptcy Court,
S.D. New York.

Oct. 27, 2000.

Harold Jones, Gersten, Savage & Kaplowitz, LLP, New York City, for plaintiff.

Paul T. Vink, White Plains, NY, for defendant.

## ORDER ADDRESSING PERSONAL LIABILITY OF THE DEBTOR'S FORMER CHAPTER 11 TRUSTEE

ALAN H. W. SHIFF, Chief Judge.[1]

The plaintiff, chapter 7 trustee John S. Pereira, seeks a determination that the defendant, the former chapter 11 trustee Henry Foong, is personally liable to the estate for expenses arising from his acts or omissions during the administration of the chapter 11 phase of this case.

### Background

The debtor, a Chinese restaurant located in New York City, filed a chapter 11 petition on January 27, 1995. On December 8, 1995, the court appointed the defendant to serve as trustee. *See* 11 U.S.C. § 1101 and 1104. The defendant served in that capacity until the case was converted to chapter 7 on May 29, 1997. The plaintiff was appointed chapter 7 trustee on June 3, 1997, and on January 13, 2000, he commenced the instant adversary proceeding.

The complaint alleges that the defendant's failure to perform his duties under 11 U.S.C. §§ 704, 1107 and 28 U.S.C. § 959 diminished the estate "in an amount not less than $590,269.00." *Complaint* at ¶¶ 11–13. The plaintiff relies on the defendant's April 8, 1997 affidavit. *See Plaintiff's Exhibit B; Tr. 1* at 12–13. The affidavit provides a schedule of unpaid taxes for the period from December 8, 1995 through February 28, 1997, disclosing employment taxes of $28,775.95 and sales taxes of $130,083.33 owed to the State of New York, and employment taxes of $348,226.51 owed to the Internal Revenue Service. *Id.* at 2 ¶ 4b. The affidavit also estimated that the estate had accrued health benefit obligations of $60,000. *Id.* at 3 ¶ 4c. *See also tr.* 2 at 117.

The following facts are derived from the testimony,[2] exhibits,[3] and the case docket.[4] The debtor operated at a loss before and after the defendant's appointment. *See Tr. 3* at 31, 35 and *Plaintiff's Exh. GGG.* The amount of the estate's unpaid obligations before the appointment is not in evidence. On July 29, 1996, the debtor filed a motion seeking to remove the defendant as trustee. *See Defendant's Exh. 2.* The motion was opposed by the creditors' committee and the defendant. *Defendant's Exh. 3; Tr. 2* at 164–5; *Tr. 3* at 41, 46–47. Following an August 7, 1996 hearing which addressed some of the same allegations asserted by the plaintiff here, the motion was denied. *See Defendant's Exh. 6* (November 5, 1996 memorandum of decision, attached as appendix B) and *Tr. 2* at 167. *See also Defendant's Exh. 4* (hearing transcript). In that ruling, Judge Garrity held that the "Debtor has not shown that any of the Trustee's business judgments have been unreasonable." *Defendant's Exh. 6* at 8. Attorney Ira Abel, who was hired by the defendant, *see* § 327(a), testified that the operation of the restaurant did not change after Judge Garrity's decision.[5] *Tr. 2* at 168.

---

1. Sitting by designation. *See February 22 and April 4, 2000 Administrative Orders.*

2. Transcripts 1–3 relate to June 13, June 14, and August 9, 2000, respectively. The first two trial days were conducted in the Southern District of New York. The final trial day was, with the consent of the parties, conducted in District of Connecticut, Bridgeport Division. *See June 29, 2000 order transferring venue.*

3. The parties acknowledged this court's admonition that they would be deemed to have abandoned any portion of their exhibits that was not identified specifically by page and line number. *See tr. 1* at 40 and *tr. 3* at 7 and 62.

4. For purposes of clarity, judicial notice has been taken of the docket. *See* Fed.R.Evid. 201, made applicable here by Fed.R.Bankr.P. 9017; *Calabro v. United States*, 830 F.Supp. 175, 178 (E.D.N.Y.1993).

5. The attorney-client privilege between the defendant and attorney Abel, *tr. 1* at 15, was waived by the current trustee. *See id.* at 15–16, *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 352, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (trustee's authority includes control of a debtor corporation's attorney-client privilege) and NEIL E. HERMAN, NOTE, WHO CONTROLS THE ATTORNEY-CLIENT PRIVILEGE IN BANKRUPTCY?, 13 HOFSTRA L.REV. 549 (1985) (discussing *Weintraub*).

The defendant testified that he understood his duties to include the payment of taxes, *tr. 3* at 12, 40, as well as "try[ing] to carry on the business, ... get a new buyer and, ... rehabilitate the restaurant." *Tr. 3* at 30–31, 52. He also understood that he had a fiduciary obligation to the estate. *Id.* at 14. Attorney Abel informed him that his duties included an obligation to pay bills, such as taxes, and convert the case if there was no reasonable possibility for reorganization. *See tr. 1* at 4–8, 85, *tr. 2* at 110–112, 144. *See also Plaintiff's Exhibit ZZ.* The defendant and attorney Abel initially determined that a plan of reorganization could be confirmed and that the estate's value would be maximized through a sale of the restaurant. *See tr. 2* at 169–70.

■ That conclusion was based, *inter alia*, on pending negotiations with several prospective buyers. Prior to the defendant's appointment, the New York City Off Track Betting Corporation ("OTB") had expressed an interest in occupying all or part of the debtor's real property. *Tr. 3* at 22–23. The defendant discontinued negotiations with the OTB when he determined that the Chinatown community opposed the presence of such a facility.[6] *Tr. 3.* at 24–28. *See also Appendix B* at 9–11. The defendant also negotiated with the union representing Ngan Gung's employees who might have been given an equity interest in the restaurant in a joint venture. *See id.* at 36–38, 41–46, 48–49, and 53. Those negotiations were conducted over a period of more than a year but ultimately failed in early 1997, *Id.* at 38–39, in part according to the defendant, because the debtor attempted to sabotage the venture by spreading false rumors in the community, *see tr. 3* at 32–33, 37 and *Appendix B.* In addition, on August 1, 1996, two investor groups, one of which has been identified as "M.W. Group, Inc. (corporation to be

formed)," provided a joint letter of intent to purchase the restaurant for $1 million for which eventually expired. *Tr. 2* at 154 and *Plaintiff's Exh. CCC.* Further, on February 5, 1997, the defendant entered into a conditional Plan Funding Agreement with Kok Hong Huie, who would invest $600,000 in the restaurant in exchange for 60% of the stock of the reorganized debtor. *See Tr. 2* at 152–4, 169, 171, and *Plaintiff's Exh. DDD* at ¶ 2. It is noted that Attorney Abel had estimated that net sale proceeds of $600,000 were necessary to fund a confirmable plan. *Tr. 2* at 169–170.

As a part of his effort to sell the restaurant as a viable going concern, the defendant terminated the incumbent management, hired new management, attempted to negotiate changes in the union contract, *tr. 3* at 15–18, and employed Flora Si, a certified public accountant with whom he had worked previously. *Tr. 1* at 33–35, *tr. 2* at 179 and *tr. 3* at 31–33, 37.

Despite those efforts, the restaurant continued to operate at a monthly loss. *See Appendix A.* As a result, the defendant decided to selectively pay the debtor's bills according to the following priorities: utilities, suppliers, rent, wages, and taxes ("more or less in that order," according to Flora Si.). *Tr. 2* at 142, 187, 204–206, 216 and *tr. 3* at 12–13, 29–30, 52. *See also Plaintiff's Exhibit ZZ.* On cross-examination, the defendant explained that he continued to operate the restaurant at a loss: "because when you close down a restaurant, it [is] worth nothing anymore ... but if there's a future, they're willing to pay for it." *Tr. 3* at 37.

On January 14, 1997, the defendant filed a motion seeking an extension of time to assume or reject nonresidential property leases. The motion was granted on February 5th. In February or March of 1997,

---

**6.** In addition to the duties enumerated in § 1106(a), *see infra slip op.* at 5, trustees also have a duty to the public at large. *See In re Landmark Plaza Limited Partnership,* 167 B.R. 752, 757 (Bankr.D.Conn.1994) ("societal considerations might be relevant ... in the confirmation process"). Accordingly, it was appropriate for the defendant to take the community's reaction into account in negotiating with the OTB.

attorney Abel informed the defendant, the creditors' committee, and the union that it would be difficult for the debtor to confirm a plan of reorganization unless the amount of the administrative claims were reduced, *tr. 2* at 156–158, 170. Attorney Abel filed a proposed plan of reorganization on March 14th and an amended plan on April 11, 1997. On April 18th, the defendant filed another motion seeking an extension of time to assume or reject the restaurant lease. The court granted the motion on May 21, 1997. Shortly thereafter, Attorney Abel determined that the amended plan was not confirmable because of the large amount of administrative claims. *See id.* at 170. He testified that if he had known about the extent of those claims, he would not have filed the amended plan. *Id.* But when questioned as to whether "[it would] be fair to say that the incurrence of administrative [claims] was ultimately the undoing of this case," attorney Abel responded "No ... [I]f some of the holders of administrative [claims] would have agreed to a reduction or a longer term payout, other than due on confirmation, the [plan] could have been confirmed." *Tr. 2* at 115. According to attorney Abel, the principal reason a buyer could not be found was the inability of the defendant to negotiate a favorable employment contract with the union. *Id.* at 17, 19. *See also* 11 U.S.C. § 1113(e). The case was converted on May 29, 1997.

7. Section 959(b) provides that
 a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. Section 960 provides that "Any officers and agents conducting any business under authority of a United States court shall be subject to all Federal, State and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation."

## DISCUSSION

### *Duties of chapter 11 Trustee*

██ A trustee has the statutory duty to protect and preserve property of the estate for the purpose of maximizing a distribution to creditors. *See* 11 U.S.C. § 1106(a); *Daniel B. Bogart, Liability of Directors of Chapter 11 Debtors in Possession,* 68 AM.BANKR.L.J. 155, 186 (Spring, 1994). A trustee also owes a fiduciary duty to each creditor of the estate. *Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Gorski v. Kirschenbaum (In re Gorski),* 766 F.2d 723, 725–726 (2nd Cir.1985) (adopting the reasoning in *Hall v. Perry (In re Cochise College Park),* 703 F.2d 1339, 1357 (9th Cir.1983)); *Bogart, supra,* 68 AM.BANKR. L.J. at 186–88. "As such, he has a duty to treat all creditors fairly and exercise that measure of care and diligence that an ordinary prudent person under similar circumstances would exercise." *Cochise,* 703 F.2d at 1357. In the performance of those duties, a trustee is obligated to pay taxes incurred during the administration of the case. *See* 28 U.S.C. §§ 959(b) and 960.[7]

██ A bankruptcy trustee is personally liable in this circuit for deliberate or negligent acts or omissions which harm the bankruptcy estate.[8] *Gorski, supra,* 766 F.2d at 726 ("liability may attach as the result of negligent, as well as knowing or intentional, breaches."). It is noted, how-

8. It is noted that the courts of appeal for the Fifth, Sixth and Tenth Circuits have held that mere negligence is insufficient to impose personal liability on a bankruptcy trustee. *See Dodson v. Huff (In re Smyth),* 207 F.3d 758 (5th Cir.2000), *reh'g. denied* (May 12, 2000) (bankruptcy trustees should not be subjected to personal liability for damages to the bankruptcy estate unless they are found to have acted with gross negligence); *Ford Motor Credit Co. v. Weaver,* 680 F.2d 451 (6th Cir. 1982) (trustee liable only for willful and deliberate acts); *Sherr v. Winkler,* 552 F.2d 1367 (10th Cir.1977) (same).

ever, that a trustee is not liable for objectively reasonable mistakes in judgment where discretion is allowed, *id., see also Cochise,* supra 703 F.2d at 1357, and, when acting in accordance with statutory or other duty or pursuant to court order, he or she is immune from suit for personal liability for such acts. *See Dana Commercial Credit Corp. v. Nisselson (In re Center Teleproductions, Inc.),* 112 B.R. 567, 576, 578 (Bankr.S.D.N.Y.1990), *citing Mosser v. Darrow,* 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951). *See also Malm v. Goldin,* 1993 WL 330489, *4, n. 2 (S.D.N.Y. 1993) (same).

 The analysis of a trustee's personal liability is prospective. *See In re C. Keffas & Son Florist, Inc.,* 240 B.R. 466, 474 (Bankr.E.D.N.Y.1999) (bankruptcy court declined to "second-[guess] the trustee in a retrospective analysis at the end of the case," and instead applied "an *ex ante* ... approach that is mandated by the trustee's statutory duty of maximizing proceeds to creditors, net of administrative expenses, and distributing those proceeds as expeditiously as possible. The proper application of [that] analysis ... require[s] the exercise of practical judgment."). *See also Bogart,* supra, 68 AM.BANKR.L.J. at 194–5. Put another way, liability will be imposed when a trustee has acted in an "objectively unreasonable manner," *Id. See also, e.g.,* 147 B.R. 970, 975 (Bankr.D.N.M. 1992) ("the issue is whether the [bankruptcy] trustee's actions were objectively reasonable.").

### *Breach of Fiduciary Duty*

An overview of the plaintiff's argument is that the defendant breached his fiduciary duty to the estate by failing to pay taxes as they became due and allowed those expenses to accumulate rather than convert the case to chapter 7. *See Plaintiff's Post–Trial Proposed Findings of Fact and Conclusions of Law.*

 Specifically, the plaintiff argues that

[i]t is the *sine qua non* of Chapter 11 that a debtor in possession or, as in this case a Chapter 11 Trustee, must remain current in the payment of expenses incurred subsequent to the commencement of the case in exchange for the many benefits that Chapter 11 provides, not the least of which is the automatic stay ...

*See id.* at 7 ¶ C. The thrust of that argument is that a trustee has breached his or her fiduciary duty and is personally liable for the consequences if he or she fails to pay administrative claims even if doing so will jeopardize a debtor's reasonable prospects of reorganization. That view of bankruptcy law and policy conflicts with the overriding purpose chapter 11. Although a trustee has a statutory duty to pay taxes, that obligation must be weighed against any conflicting duty to file a plan and maximize the estate for distribution to creditors. *See* § 1106(a)(5). That balance must tip in favor of the latter consideration if there is any reasonable prospect of reorganization, i.e., rehabilitation or orderly liquidation. *See, e.g., In re WMR Enterprises, Inc.,* 163 B.R. 884, 885 (Bankr. N.D.Fla.) (rehabilitation plan) and *In re Wire Cloth Products, Inc.,* 130 B.R. 798, 805 (Bankr.N.D.Ill.1991) (liquidation plan). Indeed, "[a] clear purpose of Chapter 11 is to benefit all parties, including the debtor and its creditors, by providing a breathing space to enable a debtor to reorganize ... [in which] the debtor proposes a plan ... to maximize value for the general benefit of all creditors, thus avoiding a mad scramble for assets." *In re Lykes Bros. Steamship Co., Inc.,* 207 B.R. 282, 284 (Bankr.M.D.Fla.1997). *See also In re Dow Corning Corp.,* 244 B.R. 634, 649 (Bankr. E.D.Mich.1999) ("chapter 11 reorganization process serves a number of important policy objectives including 'debtor relief, a preference for feasible reorganizations as opposed to liquidations, equality among similarly situated creditors, and ... distribution in an equitable way among the creditors and the debtor.' ").

The question then is whether it was objectively reasonable for the defendant to have delayed the conversion of this case with the attendant accrual of administrative claims. For the reasons that follow, it is concluded that it was. The defendant appropriately believed that his mandate from the court was to keep the business in operation so that it could be sold as a going concern, pay allowed claims, and thereafter remain viable under a new owner. *See Defendant's Exh.* 6 at 8. *See also supra, slip op.* at 3. The evidence adduced at trial supports his initial business judgment that there was a reasonable prospect of rehabilitating the debtor. That prospect continued until the union declined to modify the collective bargaining agreement and the employees declined to purchase the business. Moreover, the defendant's judgment to defer the payment of some of the taxes as they became due undoubtedly enhanced, rather than hindered, the debtor's prospects for a confirming a plan by keeping the restaurant in business and therefore more attractive for sale.[9]

The plaintiff misconstrues the obligations imposed on bankruptcy trustees by 28 U.S.C. § 959 and § 960, which require a trustee to operate a debtor's business in accordance with state and federal laws, including tax laws. Under those statutes, the consequence of a trustee's failure to timely pay taxes is the same as it would be in the non-bankruptcy context, i.e., interest would begin to accrue and penalties might be imposed. Sections 959 and 960 merely underscore a trustee's obligation to pay taxes; they do not impose an additional duty to pay them *as they become due.* Indeed, it is not uncommon in the bankruptcy context, for the payment of administrative claims, including taxes, to be deferred until the effective date of confirmation, *see* § 1129(a)(9)(A), which might be long after those claims have begun to accrue. It follows then that a trustee's obligation to pay taxes might be appropriately deferred in favor of the larger goal of maximizing the estate for distribution to all creditors and administrative claimants. As the court in *State of Ill. Dept. of Revenue v. Schechter,* 195 B.R. 380, 384 (N.D.Ill.1996) observed,

(s)ection 503(b)(1)(B) makes unpaid taxes incurred during the administration of a Chapter 11 estate an administrative expense which is entitled to first priority in payment under Section 507(a)(1). However ... taxes are not the only administrative expense entitled to priority under Section 503(b). Other administrative expenses include necessary costs incurred in operating the business, wages, [and] costs of goods ...

*Id., affirming In re Markos Gurnee Partnership,* 182 B.R. 211, 225–28 (Bankr. N.D.Ill.1995) (chapter 11 trustee "had no bankruptcy-related fiduciary duty to pay ... taxes at the time they became due.").

Notably, the plaintiff does not suggest a specific date or range of dates after which it would have been objectively unreasonable not to convert the case. Nor is any such date apparent from the evidence. Since the case was converted on May 29, 1997, arguably there might have been a period of time between May 21st, *see supra, slip op.* at 5,[10] and the 29th when unnecessary administrative expenses were incurred. But because at least some administrative expenses would have accrued even under a chapter 7 case, *see In re Caldor, Inc.,* 240 B.R. 180, 188 (Bankr. S.D.N.Y.1999), it is impossible to calculate the cost to the estate. In any event, the net amount of any such administrative expense for those eight days is likely to be

---

9. It is noted that the trustee did not refuse to pay taxes, rather he deferred their payment so that more pressing obligations could be paid first, such as utilities, suppliers, rent and wages. He also paid taxes. *See Appendix A.*

10. It is unlikely that Judge Garrity would have granted the defendant's motion for an extension of time to assume or reject the restaurant lease on May 21, 1997, if he believed that the case should have been converted at that time.

minimal. It is therefore concluded that the defendant acted reasonably in deferring the payment of post petition taxes, so that he could pay wages and other operating expenses that were necessary to keep the business operating.

Accordingly, it is determined that the defendant did not breach his fiduciary duty to the estate, judgment shall enter in his favor, AND IT IS SO ORDERED.[11]

## Appendix A

### The Debtor's Monthly Operating Reports

The monthly operating reports, *Plaintiff's Exhibit GGG (Statement of Cash Flow),* disclose the following:[1]

| Month | Operating profit (loss) | Increase or Decrease in taxes payable | in accrued expenses |
|---|---|---|---|
| January 1996 | $ (28,181) | $ +3,246 | $ +22,114 |
| February 1996 | (31,531) | +3,333 | n/a |
| March 1996 | 2,155 | +46,675 | +21,747 |
| April 1996 | (87,486) | +21,632 | +28,566 |
| May 1996 | (55,205) | −3,768 | −10,883 |
| June 1996 | (26,898) | −8,116 | −18,212 |
| July 1996 | (71,904) | −7,265 | +217,756 |
| August 1996 | (34,727) | −4,188 | +36,476 |
| September 1996 | 19,346 | +16,202 | +10,443 |
| October 1996 | (46,611) | +27,975 | +8,765 |
| November 1996 | (56,057) | −9,520 | +81,752 |
| December 1996 | (22,924) | +52,428 | −17,690 |
| January 1997 | (88,800) | +7,722 | +85,175 |
| February 1997 | (76,819) | +336,831 | −284,083 |
| March 1997 | (6,861) | +45,926 | +2,805 |
| [Total | (612,453) | +529,113 | +184,731] |

## Appendix B

(originally designated as "not for publication")

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

In re NGAN GUNG RESTAURANT, INC., d/b/a SILVER PALACE RESTAURANT, Debtor.

Chapter 11

Case No. 95 B 40383 (JLG)

MEMORANDUM DECISION ON DEBTOR'S MOTION TO REMOVE CHAPTER 11 TRUSTEE

APPEARANCES:

11. It is therefore unnecessary to address the qualified judicial immunity affirmative defense. *See supra, slip op.* at 6.

1. The debtor's monthly operating reports were prepared by Flora Si, reviewed and signed by the defendant, and submitted to attorney Abel for his review, prior to copies being provided to the attorney and accountant for the creditors' committee, and filed with the court. *See tr.* 2 at 183, 188, 199. Those reports, which were prepared on an accrual basis, *id.* at 193–4, did not, however, disclose the additional obligations incurred as a result of penalties or interest on unpaid debts, *id.* at 217, as Ms. Si conceded. *Id.* at 218. Further, they did not state the obligations incurred as a result of the reorganization itself, i.e., the attorneys' fees owed by the estate. *Id. See also tr.* 2 at 174–217.

STEVEN E. STEIN, ESQ.
401 Broadway
New York, New York, 10013
Attorney for Debtor

IRA R. ABEL, ESQ.
470 West End Avenue # 15D
New York, New York 10024
Attorney for Chapter 11 Trustee

ROSENBERG, MUSSO & WEINER
26 Court Street
Brooklyn, New York 11242
Attorney for Creditors' Committee

BEFORE James L. Garrity, Jr. United States Bankruptcy Judge

Ngan Gung Restaurant, Inc. ("debtor" or "movant") seeks an order pursuant to § 324 of the Bankruptcy Code ("Code") removing Henry C.S. Foong ("Trustee"), the chapter 11 trustee, and appointing Mr. Alfred Lui, as his substitute. The Trustee and Official Committee of Unsecured Creditors (the "Committee,") oppose the motion. We deny it.

### Facts

The background facts are not in dispute. Debtor filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code on January 27, 1995. As of the filing date, debtor owned and operated the Silver Palace Restaurant in New York City's Chinatown. On February 23, 1995, the U.S. Trustee appointed the Committee. Debtor remained in possession and control of its assets as a debtor in possession pursuant to 1107 and 1108 of the Code until on or about December 8, 1995, when, pursuant to court order entered over debtor's objection, the U.S. Trustee appointed Foong chapter 11 trustee. Debtor did not oppose the U.S. Trustee's selection of Foong. Foong is operating the debtor's business pursuant to § 1108 of the Code.

Post-petition and before the Trustee's appointment, the debtor ceased to operate its dim sum cart service and upon doing so, fired several union employees. Debtor allegedly was speaking with representatives of New York City's Off Track Betting Corporation ("OTB") about subleasing its premises to OTB to enable OTB to open a betting parlor in the restaurant. Debtor contends that if consummated, that arrangement will yield debtor more than $ 8 million over the life of the sublease.

Immediately upon his appointment, the Trustee reinstated the restaurant's dim sum cart service and hired employees to operate it. He also discharged and replaced certain long time managers and maitres d'hotel. The Trustee has not pursued negotiations with OTB. The restaurant has incurred losses during the Trustee's tenure.

### Discussion

Our subject matter jurisdiction of this proceeding is predicated on 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding. See 28 U.S.C. § 157(b)(2)(A). Section 324(a) of the Code provides that 11 "[t]he court, after notice and a hearing, may remove a trustee, other than the United States trustee, or an examiner, for cause." See 11 U.S.C. § 324(a). As movant, debtor bears the burden of proving cause under § 324. See In re Lundborg, 110 B.R. 106, 108 (Bankr.D.Conn.1990). "Cause" is not defined in the statute and that determination is left for the courts on a case by case basis. Id. As described by the Lundborg court:

> [c]ause [for relief under § 324] has been found to exist, inter alia, where the trustee is not disinterested, In re BH & P, Inc., 103 B.R. 556, 561 (Bankr.D.N.J. 1989); In re Paolino, 80 B.R. 341, 344 (Bankr.E.D.Pa.1987), and where the trustee fails to perform his or her duties, Matter of Schoen Enter., Inc., 76 B.R. 203, 206 (Bankr.M.D.Fla.1987), or unreasonably delays in the performance of

those duties, *Matter of Island Amusement, Inc.*, 74 B.R. 18, 19 (Bankr.D.P.R. 1987); *In re Mira–Pak, Inc.*, 72 B.R. 430, 431 (Bankr.S.D.Tex.1987). In general, a party seeking the removal of a trustee must prove that there has been some actual injury or fraud. *In re Acadiana Electrical Serv.*, 66 B.R., 164, 165 (Bankr.W.D.La.1986); *United States ex rel. People's Banking Co. v. Derryberry (In re Hartley)*, 50 B.R. 852, 859 (Bankr. N.D.Ohio 1985). *See also Matter of Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir.1965).

*Id.* at 108. Reasonable mistakes in judgment are not grounds under § 324 for removing a chapter 11 trustee. *See In re Cee Jay Discount Stores, Inc.*, 171 B.R. 173, 175 (Bankr.E.D.N.Y.1994) ("mistakes in discretionary judgement which are reasonable, do not warrant removal"); *In re Reed*, 178 B.R. 817, 821 (Bankr.D.Ariz. 1995) ("[A] trustee is not responsible, and therefore should not be removed, for mistakes in judgement where the judgement is both reasonable and discretionary"); *In re University Avenue Properties*, 55 B.R. 986, 988 (Bankr.E.D.Wisc.1986) ("Where the court believes that a trustee has not willfully and deliberately breached his fiduciary duties to the estate but has instead utilized his discretion in exercising business judgement, there is no cause for removal."). Debtor contends that the Trustee's agenda is to create jobs for union employees and that in attempting to further that goal, he is mismanaging the restaurant. The debtor asserts that: (i) the Trustee reinstated dim sum cart service and rehired union employees notwithstanding that debtor's termination of that service allegedly reduced monthly operating expenses by $25,000 to $30,000; and (ii) the trustee discharged several long time restaurant managers and maitres d'hotel because they are nonunion, employees who were aligned with management, and replaced them with inexperienced managers lacking contacts in the Chinese community resulting in a decline of debtor's banquet business. The debtor also alleges that (iii) the restaurant has incurred significantly greater losses during the Trustee's tenure than had occurred while the debtor was in possession; (iv) non-unionized and unionized employees are currently owed five and seven weeks salary, respectively; (v) the Trustee has not paid unemployment taxes to the New York State Department of Labor; and (vi) the Trustee lacks experience and contacts to civic and community organizations and has been unable to attract and book banquets during his tenure.

Debtor contends that the Trustee terminated debtor's negotiations with OTB just as debtor was about to secure a sublease of its premises which allegedly would generate $8,654,413 over the life of the sublease. Debtor maintains that it could fund a reorganization plan with the sublease proceeds. Debtor contends that the Trustee's reversal of prior management's business decisions demonstrates his lack of objectivity and bias towards the union and his inability to act in the best interest of debtor's estate and creditors. It also alleges that the Trustee's failure to propose a plan of reorganization constitutes cause under § 324 of the Code for his removal.

The Trustee disputes debtor's allegations of mismanagement. He argues that his decisions regarding the restaurant's operations are based on his good faith business judgement. He claims that management's reductions in business hours and elimination of dim sum services merely decreased the debtor's cash flow without saving debtor money. The Trustee also argues that the debtor incurred substantial losses under prior management and that debtor's so-called "cost-saving measures" amounted to the cessation of the payment of administrative expenses. It is undisputed that when the Trustee assumed control of debtor's business he discovered, among other things, accrued unpaid administrative expenses, including (i) trade debt to debtor's suppliers totaling $30,000; (ii)

state and federal taxes totaling approximately $93,657.97 and $111,405.53, respectively; (iii) taxes to New York State Department of Labor totaling $15,693.83 and (iv) trade union benefits totaling $40,000.

The Trustee defends his decisions to reinstate dim sum cart service, rehire certain employees and fire others as legitimate business decisions. He denies having any connection to the union and contends that he is disinterested. The Trustee alleges that debtor's former management is undermining his reorganization efforts by actively disparaging his efforts to reorganize the debtor and encouraging many people in the Chinatown community to avoid eating or booking banquets at the restaurant. He states that despite that destructive force he has culled 66 reservations for banquets for the remaining six months of 1996 and is seeking to resolve the problems of unpaid wages and administrative taxes and is negotiating consensual resolutions to plan issues with the debtor's major creditors. The Trustee also disputes former management's contentions regarding the OTB sublease agreement, claiming that the agreement was previously rejected by the creditors and that, in any event, debtor never formally presented it for court approval. He also points out that debtor did not pursue revised lease agreements with its landlord—a necessary prerequisite to the negotiation of the OTB sublease agreement.

Debtor does not allege and has not shown that the Trustee committed fraud in fulfilling his duties. While debtor contends that the Trustee's alleged gross mismanagement of its business has injured the business, it does not substantiate that allegation. The Trustee's unchallenged testimony is that dim sum service is profitable and that he removed employees because he believed that they were mismanaging the business. *Transcript of Hearing On Motion To Remove Trustee ("Transcript")*, 65–67.

Debtor failed to show any connection between the Trustee and the union, or that the Trustee is otherwise not disinterested. The fact that the dim Bum employees rehired by the Trustee happen to be union employees does not evidence bias because all of debtor's dim sum employees are union employees. Moreover, debtor's assertion that the Trustee terminated certain restaurant managers and maitres d'hotel exclusively because they were non-union finds no support in the record. The undisputed evidence shows that the Trustee so acted to reverse the losses at the restaurant. Id.

There is no dispute that debtor's operations under the Trustee have not been profitable. That alone is no basis to grant debtor's motion. Debtor is not entitled to relief because it alleges, but did not prove, that the losses are caused by the Trustee's poor business judgment and his lack of experience in the restaurant business. Debtor has not shown that any of the Trustee's business judgments have been unreasonable. *See In re Cee Jay Discount Stores, Inc.*, 171 B.R. at 175 ("mistakes in discretionary judgement which are reasonable, do not warrant removal"). *Compare In re Vega*, 102 B.R. 552 (Bankr.N.D.Tex. 1989) (chapter 7 trustee was removed for unauthorized receipt of estate assets, violation of fiduciary duties and unauthorized payments to professionals).

Likewise the Trustee's failure to propose a plan of reorganization is not grounds to grant this motion. The Trustee's undisputed testimony is that he is seeking solutions to the problems of unpaid wages and taxes and is negotiating consensual resolutions to plan issues with debtor's major creditors. *Transcript*, 102–104. Those negotiations must conclude before the Trustee can file a reorganization plan. *Compare In re Brown*, 108 B.R. 802 (Bankr.S.D.Fla.1989) (trustee was removed because of a delay of 14 years in closing the case; there, the court considered trustee's 90 days of vacation each year a breach of his duties). In any event debtor

can file a reorganization plan of its own. *See* 11 U.S.C. § 1121(c). It has not done so.

We are troubled by the Trustee's treatment of the OTB sublease. At the hearing he testified as follows:

Q: When did you first become aware of negotiations between the Debtor and New York City Off Track Betting Corporation?

A: For OTB, as a matter of fact, I never negotiate with them. They did call me whether we considered putting OTS—putting OTB into the Silver Palace Restaurant. At that time we are so new I told them, at that moment, we didn't have any decision on doing anything yet on that OTB deal and later on we found out that the community also against the 0 –putting another OTB into Chinatown and which there is like another one, and a half block away. So then, after I'm in office for a period of time, that we—I decided not to put on OTB because that's not our goal, for the community....

Q: Did you analyze the OTB transaction?

A: Well, I didn't look into it. I did not look into it.

Q: Did you make a determination if the OTB transaction would be in the best interest of the creditors compared to operating the restaurant?

A: Well, I didn't see any advantages. I didn't see any advantages at all.

Q: Did you make an analysis though?

A: I don't put too much attention on OTB to—after we take over the office and then we heard so many news on the street and a lot of news from the media, from newspaper and people been against it, and oppose it, also from the employee, from especially the Silver Palace employee. We didn't want to see OTB going into it.

Q: Did you determine where the opposition within the community was coming from?

A: See, my goal is to perform the restaurant and rehiring people into that particular restaurant, which giving more jobs, rather than go into detail that I don't know what it's going to be happening in the future.

*Transcript,* 61–63.

A chapter 11 trustee has a fiduciary obligation to conserve the assets of the estate and to maximize distributions to creditors. *In re Rigden,* 795 F.2d 727, 730 (9th Cir.1986); *Bennett v. Williams,* 892 F.2d 822, 823 (9th Cir.1989); *Northwestern Nat. Bank of St. Paul v. Halux, Inc. (In re Halux, Inc.),* 665 F.2d 213, 216 (8th Cir. 1981); *Carson, Pirie Scott Co. v. Turner,* 61 F.2d 693, 694 (6th Cir.1932); *In re Gucci,* 174 B.R. 401, 412 (Bankr.S.D.N.Y. 1994). A trustee must be independent, vigorous and efficient, *see Gross v. Russo (In re Russo),* 18 B.R. 257, 273 (Bankr. E.D.N.Y.1982) (removing conflicted trustee), and a trustee's ignorance of his statutory duties is no defense to sanctions. *In re Consupak,* 87 B.R. 529, 545 (Bkrtcy. N.D.Ill.1988) (quoting Restatement (Second) of Trusts 201, comment b (1959)). In determining whether to remove a trustee, we must balance the disruption to the administration of the estate and the harm that will be caused by retaining the trustee. *In re Carla Leather, Inc.,* 44 B.R. 457, 473 (Bankr.S.D.N.Y.1984), *aff'd,* 50 B.R. 764 (S.D.N.Y.1985).

It appears from the testimony cited above that the Trustee may have reacted to the OTB matter without regard to the best interests of the estate and creditors. We are concerned with the Trustee's apparent misapprehension of his fiduciary duties. However, his apparent failure to regard estate interests in connection with the OTB sublease is not grounds to remove him.

The Trustee was appointed in response to management's wrongdoing. *See In re Ngan Gung Restaurant, Inc.,* 195 B.R.

**578**

593, 594 (S.D.N.Y.1996). His appointment necessarily has increased administrative expenses and inevitably and understandably caused some delay in this case. If we remove Foong and the U.S. Trustee appoints a replacement trustee, that person likely would retain counsel and an accountant to assist him. Those professionals would require time to familiarize themselves with debtor's operations. The replacement trustee might implement his own changes to debtor's operations. Thus, the estate will suffer from added delays and costs. Those additional burdens are not justified especially because the debtor adduced no evidence of the OTB sublease. Even if it could show that the OTB sublease might be viable, we would not remove the Trustee because the disruption to the administration of the case greatly outweighs any harm to the estate in retaining him. If debtor believes that pursuit of the OTB sublease is in the best interests of the estate, it can pursue it and file its own reorganization plan. *See* 11 U.S.C. § 1121(c).

*Conclusion*

Based on the foregoing, we deny the debtor's motion.

SETTLE ORDER.

/s/ James L. Garrity Jr.
United States Bankruptcy Judge

Dated: New York, New York
November 5, 1996